USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-5-05

7/15/05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

DAVID WILLIAMS                            :

                        Plaintiff,        :

        - against -                       :

NEW YORK CITY (THE CITY DEPT. OF          :
CORRECTIONS); BRIAN RIORDAN (DEPUTY
WARDEN OF SECURITY/B.B.K.C FACILITY);     :
CARLIS E. THOMPSON (DEPUTY
WARDEN SECURITY/G.R.V.C. FACILITY);       :
ROGER SLATTERY (WARDEN OF G.R.V.C.
FACILITY),                                :

                        Defendants.       :

------------------------------------------x

**MEMORANDUM AND**
**O R D E R**

03 Civ. 3543 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff David Williams ("plaintiff") brings this § 1983 action against New York City, the City's Department of Corrections ("DOC"), and DOC officers Brian Riordan, Carlis E. Thompson, and Roger Slattery (collectively, "defendants") seeking compensatory and punitive damages as well as injunctive relief for their alleged failure to provide a hearing and a hands-on medical review after placing plaintiff on "Red I.D." status subsequent to his arrest. The DOC uses Red I.D. status to identify prisoners who have been found in possession of a weapon or using a weapon in prison. As a prisoner designated with Red I.D. status, plaintiff was placed in uncomfortable "enhanced" restraints when he was transported outside of the prison. Plaintiff and defendants have both moved for

summary judgment. For the following reasons, plaintiff's motion is granted in part and denied in part, and defendants' motion is granted in part and denied in part.

## BACKGROUND

In July 1997, David Williams was a pretrial detainee in the custody of the DOC. After being in custody for approximately ten days, corrections officers conducted a search of his cell and found a piece of metal wedged between his locker and shelf. Deposition Transcript of David Williams ("Pl. Dep.") at 21-22. Corrections officials determined that the piece of metal was a weapon and accordingly placed plaintiff on "Red I.D. status." Id.

Inmates found to possess a weapon while in custody are typically placed on Red I.D. status. Red I.D. status is designed to "reduce stabbings and slashings outside of the jails in places like courthouses." Benjamin v. Kerik, 102 F. Supp. 2d 157, 168 (S.D.N.Y. 2000), aff'd, Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001). When placed on Red I.D. status, an inmate wears a red identification card that alerts corrections officers to his status. When transported outside of the jail, the inmate is placed in enhanced restraints: a Red I.D. inmate's hands are placed in black plastic security mitts to prevent movement; his hands are cuffed behind him with his palms facing out, then attached to a chain that

2

goes around his waist; finally, a box is often placed over the handcuffs in order to prevent moving or shifting.[1]

On December 28, 2000, the DOC promulgated Directive #4518, entitled "Red ID Status and Enhanced Restraint Status Due Process" ("Directive"). Defendants' Exhibit ("Def. Ex.") E. The Directive was adopted as a consequence of an order of Judge Harold Baer of this Court, which required procedural requirements for using Red I.D. Benjamin v. Fraser, No. 75 Civ. 3073 (HB), slip op. at 2-3 (August 10, 2000). Among other provisions, the Directive required that "[w]ithin 72 hours of service of notice on an inmate of his or her placement into Red ID . . . Status, a departmental Hearing Officer shall conduct a hearing for the purpose of adjudicating all pending infractions [and] Red ID Status." Directive at 4. The Directive also required that the facility medical clinic be notified of all new Red I.D. placements within twenty-four hours of initial placement. Specifically, the Directive required medical staff to review the records of all new placements and examine them physically, if necessary, to determine whether the enhanced restraints were likely to have significant medical consequences. Furthermore, the Directive required medical staff to conduct a monthly medical review of each Red I.D. detainee to determine if he had a serious medical problem or condition that should preclude him from being restrained in a given manner. Directive at 8-9.

[1] For further description of Red I.D. status, see Benjamin v. Fraser, 264 F.3d 175, 181-182 (2d Cir. 2001).

3

Between 1997 and 2002, plaintiff was in DOC custody several times. Pl. Dep. at 34, 38-39. Each time he returned to Riker's Island he was placed on Red I.D. status because of the 1997 infraction. Id. Plaintiff was arrested again on September 16, 2002 and sent to the Riker's Island Bernard B. Kerik Center ("BBKC") on September 17, 2002. In the late afternoon or early evening of that day, plaintiff was informed by a captain that he was being re-classified as a Red I.D. inmate. Id. at 43. Subsequently, in the mid-afternoon or evening of the same day, plaintiff claims that he was given written notice of the re-activation of his status and that a hearing was to be provided for him within 72 hours. Id.

Two days later, on September 19, and before Williams had received a hearing on his Red I.D. status or a medical examination, he was transferred to the George R. Vierno Center ("GRVC"). Pl. Dep. at 44. Once at the GRVC, plaintiff was kept in Red I.D. status without receiving a hearing, new written notice, or a medical evaluation. Plaintiff alleges that on September 20, he was transported to the Manhattan Criminal Courthouse and spent between ten and fourteen hours in enhanced restraints. Plaintiff's Amended Complaint ("Am. Compl.") Section 4A, at 1. On September 23, a notation was made on plaintiff's medical chart clearing him for Red I.D. status. Def. Ex. F. Plaintiff appealed his placement in Red I.D. status on October 15, 2002 by filing a written appeal with the

4

Deputy Warden of Security, Carlis Thompson. At the end of his appeal letter, plaintiff wrote, "I would also like to add that I never received a hearing on this matter at all." Plaintiff's Exhibit ("Pl. Ex.") 1. On October 23, 2002, Thompson replied with a written "Notice of Appeal Determination for Red ID Status," continuing plaintiff's Red I.D. status after a review of plaintiff's infraction history.[2] Pl. Ex. 2.

On November 7, 2002, plaintiff filed a grievance report through the Inmate Grievance Resolution Committee ("IGRC"), complaining about the buses in which Red I.D. status inmates were transported. Pl. Ex. 3. This grievance was denied by the IGRC because it was determined to be "beyond the purview of the IGRC." A copy of this reply was addressed to the warden of GRVC, Roger Slattery. Pl. Ex. 3a.

Although plaintiff had been wearing a Red I.D. since he arrived at the GRVC, on November 12, 2002, plaintiff received a "Notice of Authorization for Initial Placement in Red ID Status" ("Placement Notice") based on "prior history contraband weapon." Pl. Ex. 4. That same day, medical staff indicated on the medical assessment form that, based on a review of plaintiff's medical records, he was cleared for Red I.D. status. Pl. Ex. 6. The

---

[2] The Directive requires that the Deputy Warden of Security render a written decision of a Red I.D. appeals within seven days of receiving it. Directive at 7. It appears that Thompson met this requirement. In any event, plaintiff does not complain that his appeal decision was late.

following day, November 13, 2002, a hearing was held with plaintiff present, and the hearing officer issued a written opinion continuing plaintiff's Red I.D. status. Pl. Ex. 5. On December 19, 2002, plaintiff was transferred out of the GRVC.

From September 17 until his transfer out of the GRVC, plaintiff was allegedly placed in enhanced restraints five times, all for court appearances. Only one court appearance was before plaintiff was cleared for Red I.D. status on September 23rd. The first four times occurred before plaintiff's November 13 hearing. Am. Compl. Section 4A, at 1. Plaintiff was allegedly in restraints from three to fourteen hours per day, with some breaks for lunch and time in the courtroom. Id. Plaintiff complains that, as a result of his time in restraints, he suffers from extensive back, neck, shoulder and arm pain, including "numbness in wrists while in restraint gear" and "involuntary muscle spasms in lower and upper back." Am. Compl. Section 4A, at 2.

Plaintiff has filed suit under 42 U.S.C. § 1983, alleging a denial of due process because of the failure to receive a timely hearing and required medical reviews. Plaintiff seeks injunctive relief that includes release from Red I.D. status and the expungement of his Red I.D. status from his record; in addition, plaintiff seeks $125,000 in compensatory damages and $125,000 in punitive damages.

Plaintiff has moved for summary judgment under Fed. R. Civ. P.

56; defendant opposes plaintiff's motion and has filed a cross-motion for summary judgment.

## DISCUSSION

### I.  Legal Standard

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party."  In re Chateaugay Corp., 10 F.3d 944, 957 (2d Cir. 1993). However, "the mere existence of a scintilla of evidence in support of [a non-moving party's] position will be insufficient [to defeat summary judgment]; there must be some evidence on which the jury could reasonably find for the [non-moving party]."  Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986).  See also Quarles v.

7

General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) ("Mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.")

In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 256. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248 (internal quotation marks omitted).

## II. Due Process Claim

Plaintiff claims that his due process rights were violated because he did not receive a hearing within 72 hours of the reactivation of his Red I.D. status and because he did not receive an in-person medical examination within 48 hours of his new Red I.D. designation. Though the Directive called for a hearing within 72 hours of serving notice on an inmate informing him of his placement in Red I.D. status, plaintiff did not have a hearing until almost two months had passed from the reactivation of his prior status. The Directive also called for medical review of new Red I.D. placements and monthly review of the suitability of enhanced restraints for all Red I.D. inmates, although it did not require in person examinations, and plaintiff makes some allegations that the medical review he received was inadequate. We address each issue in turn.

8

## A.    Hearing Requirement

The first question that we must address is whether plaintiff has a constitutionally protected due process right to a hearing as outlined by the Directive.

Ordinarily, a prisoner's due process rights are analyzed under Sandin v. Conner. 515 U.S. 472 (1995).  The Sandin jurisprudence, however, and its "justification for limiting a convicted inmate's rights . . . does not apply to pretrial detainees." Benjamin v. Kerik, 102 F. Supp. 2d at 172.  See also Benjamin v. Fraser, 264 F.3d at 189 (affirming Benjamin v. Kerik and noting that Sandin "specifically distinguished pretrial detainees from convicted prisoners").

Judge Harold Baer conducted an extensive review of Red I.D. status and the procedural safeguards required to impose it in Benjamin v. Kerik, 102 F. Supp. 2d at 157.  He concluded that Red I.D. caused significant physical harm, and that it "ha[s] a severe and deleterious effect on pretrial detainees tantamount to punishment." Id. at 175.  Judge Baer concluded that the imposition of Red I.D. status requires "a prompt hearing and periodic review and [its] use must be carefully supervised." Id.  Judge Baer then ordered the defendants to suggest prospective relief to remedy the breach of due process.   The defendant's subsequent suggestions became the basis for the Directive at issue in this case.  Benjamin v. Fraser, No. 75 Civ. 3073(HB), slip op. (August 10, 2000).  The

9

required procedures follow the requirements outlined in Wolff v. McDonnell, 418 U.S. 539 (1974) before deprivations of prisoners' liberty interests can occur: notice, a written statement of the facts supporting the charge (to be used in the event of review), and a hearing where the prisoner is able to present witnesses and evidence on his behalf, subject to the discretion of the prison authorities. Wolff, 418 U.S. at 563-566.

The Second Circuit affirmed Judge Baer's determination that pretrial detainees have a protected liberty interest in not being assigned Red I.D. status. Benjamin v. Fraser, 264 F.3d at 190. The Court also found that the procedures Judge Baer required subsequent to imposing Red I.D. status--now incorporated in the Directive--are entirely reasonable, satisfy pretrial detainees' due process rights, and "extend[] no further than necessary, and [are] the narrowly drawn, least intrusive means to correct the violation." Id., 264 F.3d at 190-91.

Because the Second Circuit concluded that the hearing procedures approved by Judge Baer (and embodied in the Directive) are the minimum necessary to correct the violation, the state violates a prisoner's due process rights if the hearing requirements of the Directive are not met. Therefore, a prisoner can assert a claim for a violation of his due process rights when-- as alleged here--the procedures regarding a hearing prescribed by Judge Baer are not followed.

**B.    Medical Evaluation Requirements**

The second question that we must address is whether the lack of a medical examination of which plaintiff complains violated his right to due process.  Plaintiff complains that he did not receive a hands-on medical examination following his initial placement on Red I.D. status.  The Directive, however, does not require a hands-on medical examination.    The Directive requires that medical personnel be notified that an inmate has been assigned to Red I.D. status within twenty-four hours of completing the Placement Notice and then requires production of the inmate within twenty-four hours if the medical staff decides it needs to examine him.  Directive at 8.

The basis of plaintiff's assertion that he was supposed to receive a hands-on medical evaluation appears to be Judge Baer's September 27, 2003 opinion and order granting in part plaintiffs' motion to hold defendants in contempt for violation of his August 10, 2000 order regarding Red I.D. status. Benjamin v. Fraser, 2002 U.S. Dist. LEXIS 18342 at *38-*41 (S.D.N.Y. Sept. 27, 2002).  See also Plaintiff's Affidavit in Support of Motion for Summary Judgment at 6.  The opinion provided that the Benjamin defendants would be fined when, inter alia, they failed to provide an initial hands-on medical review within forty-eight hours of an inmate being placed in Red I.D. and when the Deputy Warden of Security at a facility failed to provide medical staff with the names of Red I.D.

inmates for monthly review. Benjamin v. Fraser, 2002 U.S. Dist. LEXIS 18342 at *38-*41 (S.D.N.Y. Sept. 27, 2002). The September 27, 2002 order's provisions for fines did not, however, take effect until after plaintiff's re-designation as Red I.D. following his arrest on September 17, 2002, so defendants' failure to provide him with an hands-on medical review then did not violate Judge Baer's order.

## III.  New York City Department of Corrections

Plaintiff's claims against the Department of Corrections must be dismissed as a matter of law. It is well established that the Department of Corrections is a non-suable entity. Chapter 17, § 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency." "[S]uits against the DOC are suits against a non-suable entity and are properly dismissed." Echevarria v. Dep't of Correctional Services of New York City, 48 F. Supp. 2d 388, 391 (S.D.N.Y. 1999)(citing cases). Therefore, defendants' motion for summary judgment with respect to claims against the DOC is granted, and plaintiff's motion for summary judgment with respect to those claims is denied.

## IV.  City of New York

In order for a municipality to be held liable for a constitutional violation, the violation must occur because of an

12

"official municipal custom, policy or practice which causes the violation of the plaintiff's rights." Martin v. City of New York, 627 F. Supp. 892, 895 (E.D.N.Y. 1985). "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. New York City Dep't of Social Services, 436 U.S. 658, 691 (1978). Plaintiff must offer some evidence that the violation occurred because of a consistent policy or practice of the municipality, and not merely because some City employees are alleged tortfeasors. In his cause of action against the City, plaintiff fails to allege that a City policy caused his rights to be violated. Indeed, plaintiff's claim is precisely the opposite: he argues that corrections officials' failure to follow the Directive is the reason for his alleged deprivation. Because plaintiff has not alleged that the problem of which he complains occurred as the result of official custom or practice, there is no genuine issue of material fact as to this issue. Accordingly, defendants' motion for summary judgment with regard to claims against the City of New York is granted, and plaintiff's motion for summary judgment with respect to those claims is denied.

## V. Defendants Riordan, Slattery, and Thompson

In order to hold an individual liable for a § 1983 violation, plaintiff must demonstrate that the defendant was personally involved in the alleged deprivation. McKinnon v. Patterson, 568 F.2d 930 (2d Cir. 1977). There are several ways in which a

13

supervisor may be deemed to have had personal involvement:

> Supervisory liability under § 1983 "can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring."

Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003)(citing Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003)). We now turn to examine whether there is a material issue of fact as to the involvement of each of the named individual defendants.

## A. Defendant Riordan

Plaintiff has filed a claim against Brian Riordan in his role as the Deputy Warden of Security of BBKC, where plaintiff was held for approximately two days. Pl. Dep. 43-44. Given the short period of time, plaintiff cannot prove any violation of his due process rights with regard to the mandatory 72-hour hearing while at BBKC--he simply was not there long enough to assert that his right to a hearing was violated. Indeed, no one at BBKC can be held liable for that alleged due process violation. Therefore, defendants' motion for summary judgment with respect to defendant Riordan's liability for failure to provide a hearing is granted and plaintiff's motion denied.

## B. Defendant Slattery

14

Plaintiff has also accused Warden Roger Slattery of the GRVC of violating his constitutional rights. Plaintiff has presented no evidence to show that defendant Slattery had any knowledge or involvement in the alleged denial of his due process rights. The sole mention of Slattery's name in plaintiff'S pleadings is on the copy Slattery allegedly received of the IGRC's response to plaintiff that his grievance regarding the safety of the bus used to transport Red I.D. inmates was non-grievable. Pl. Exs. 3 and 3a. There is no mention of plaintiff's alleged denial of due process in either plaintiff's original grievance or the IGRC's response. Therefore, plaintiff has failed to allege that Warden Slattery was involved in or aware of plaintiff's due process complaints.

Furthermore, plaintiff has not alleged facts to support a conclusion that Slattery was "grossly negligent" in his "supervision of subordinates who committed a violation," Richardson, 347 F.3d at 435, where "gross negligence 'is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'" Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998) (citing AT&T Co. v. City of New York, 83 F.3d 549, 556 (2d Cir. 1996)). Plaintiff has not alleged any facts that suggest Slattery could be considered grossly negligent. Defendants' motion for summary judgment is therefore granted and plaintiff's motion denied with regard to all claims against

15

defendant Slattery.

## C. Defendant Thompson

Defendant Carlis Thompson was Deputy Warden of Security at the GRVC. Plaintiff claims that defendant Thompson violated his due process rights by failing to afford plaintiff a timely hearing. Plaintiff has submitted evidence demonstrating that Thompson knew or should have known that a due process violation had taken place. Plaintiff, following the appeal procedures provided by the Directive, submitted an appeal of his Red I.D. status on October 15, 2002, which was addressed to Thompson. The appeal argued that plaintiff should no longer be on Red I.D. and also stated, "I would also like to add that I never received a hearing on this matter at all." Pl. Ex. 1. Thompson responded to this appeal in writing and continued plaintiff's Red I.D. status without mentioning plaintiff's claim of a denial of a hearing.

Defendants argue that it is the responsibility of the Deputy Warden of Security to review appeals of Red I.D. status, but that it is not his responsibility to make certain that an inmate is provided with a Placement Notice and a hearing. Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment at 15-16. The Directive assigns the completion of a Placement Notice to the "area supervisor or a designated supervisor," Directive at 3, while conducting the hearing falls to

16

a departmental Hearing Officer, also called an Adjudication Captain. Id. at 3-4. The Directive makes clear, however, that while conducting the hearing is not the responsibility of the Deputy Warden of Security, arranging the hearing is. The Directive explicitly delegates to the Deputy Warden of Security the majority of responsibilities involved with the administration of the Red I.D. program in general, and with the initiation of hearings in particular;[3] many other responsibilities the Directive describes only in the passive voice presumably fall to him as well. Furthermore, all the forms associated with the Directive contain instructions to send the original or a copy to the Deputy Warden of Security. Def. Ex. E. We are persuaded that the Deputy Warden of Security is sufficiently involved in initiating Red I.D. hearings that he is responsible for taking action when he learns that an inmate has not received one.

Furthermore, a supervisor may be held liable under § 1983 for "failure to remedy a wrong after being informed through a report or

---

[3] The Deputy Warden of Security is responsible for ensuring that the Hearing Officer is provided with various materials for the hearing, including a copy of any notice of infraction, the inmate's Placement Notice, all relevant evidence, and the inmate's history; for revoking the Red I.D. status of an inmate when a Hearing Officer determines the inmate was not guilty of an infraction; for delivering to an inmate the Hearing Officer's determination of his hearing; for processing, deciding, and notifying an inmate of the result of an appeal of his Red I.D. hearing; for providing the names of all Red I.D. inmates to the facility's medical staff; and for discussing alternative means of restraining a Red I.D. inmate who the medical staff believes would suffer adverse medical consequences from enhanced restraints. Directive at 4, 6-9.

17

appeal." Richardson, 347 F.3d at 435 (emphasis added). It is uncontested that plaintiff did not receive a hearing until November 13, 2002, three weeks after Thompson's response to the appeal. Thompson was or should have become aware that plaintiff had not received a hearing through plaintiff's appeal. For the foregoing reasons, plaintiff's motion for summary judgment with respect to his due process claim against Thompson is granted and defendants' motion for summary judgment with respect to that claim is denied.[4]

## VI. Damages and Relief

The due process violation here, while supportable, was wholly insubstantial. It would appear that plaintiff simply fell through the cracks when he was transferred. Thompson's only failing was that, after learning in the course of the appeal that plaintiff had never received an initial post-deprivation hearing, he waited a few weeks before remedying the situation. Thompson's delay may have been motivated by a belief that an inmate whose appeal had already decided agains the prisoner was not entitled to a hearing. In any case, plaintiff's relief is limited because the delay of his hearing was not a cause of his alleged injury.

---

[4] Any claims against Thompson for denial of due process with respect to medical reviews are, however, without merit. The Directive requires that the facility medical clinic be notified that an inmate has been placed in Red I.D. status within 24 hours of the completion of the Placement Notice. Plaintiff only received one Placement Notice while he was at the GRVC, on November 12, 2002, and medical staff cleared him for Red I.D. status the same day. Thompson may have failed to give plaintiff a hearing within 72 hours of learning that plaintiff had not yet received one, but he did not fail to inform the medical clinic after completing a new Placement Notice for plaintiff.

18

Plaintiff has requested a variety of remedies. First, he asks that we enjoin his Red I.D. status and expunge his record, arguing that his current status is predicated on his 1997 infraction and should therefore be changed. While plaintiff has stated a claim for denial of due process, he has not asserted any facts or law that indicate his Red I.D. classification itself, as opposed to his lack of procedural due process, is a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In the absence of any basis to conclude that plaintiff's Red I.D. classification is itself in violation of the federal Constitution or laws, we will not consider ordering the defendants to alter it.

Second, plaintiff asks that we "extinguish the [defendants'] fire of arrogance" by ordering defendants to remove their slogan ("New York City's Boldest") from all transport vehicles and "all other existing places."
Plaintiff's Pre-Hearing Memorandum of Law in Support of United States Constitutional Rights Violations at 17, which is attached to plaintiff's Amended Complaint and which we treat as part of plaintiff's Amended Complaint. This meritless request deserves no more discussion than a denial.

Third, plaintiff seeks monetary damages. We conclude in this regard that because plaintiff's alleged injury is not the result of his due process violation, he may recover only nominal damages. In

19

Carey v. Piphus, 435 U.S. 247 (1978), the Supreme Court examined the issue of what damages are available for a violation of due process rights where the same consequences would have resulted had due process been provided. In Carey, students who claimed that they had been suspended from school without due process filed a complaint against the school board. Id. at 248. The Seventh Circuit had held that the students were "entitled to recover substantial nonpunitive damages even if their suspensions were justified." Id. The Supreme Court disagreed, explaining that "in the absence of proof of actual injury, the students are entitled to recover only nominal damages." Id. See also LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 431 (2d Cir. 1995) (noting that "[a] plaintiff who has proven a civil rights violation but has not proven actual compensable injury, is entitled to an award of nominal damages."). The Court noted that:

> By making deprivation of ["absolute"] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury.

Carey, 435 U.S. at 266.

Here, plaintiff has not shown that he suffered any actual injury as a result of his alleged deprivation of rights. Had he been afforded due process, it appears that nothing would have changed for plaintiff. When plaintiff's hearing was granted,

20

albeit allegedly two months later than required, his Red I.D. status was continued. While Red I.D. is unpleasant and may have harmed plaintiff, plaintiff would have endured the same harm had due process been afforded. As the Supreme Court explained in Carey, while any deprivation of rights is a serious matter, the Court cannot compensate an individual for an injury he did not suffer as a result of the deprivation. We therefore award plaintiff nominal damages in the amount of one dollar.

## CONCLUSION

In summary, plaintiff's claims against the DOC must fail because the DOC is a non-suable entity under the New York City Charter. Plaintiff's claims against the City of New York also fail because plaintiff has not produced any evidence that his alleged denial of due process was the result of a widespread custom or official policy of the City. Plaintiff's claims against defendants Riordan and Slattery are dismissed because of plaintiff's failure to demonstrate personal involvement on the part of those individual defendants. Finally, we grant plaintiff's motion for summary judgment against defendant Thompson because it is not disputed that Thompson was alerted to the violation of plaintiff's due process rights through plaintiff's appeal and failed to act. We award plaintiff nominal damages in the amount of one dollar. As all issues raised by the complaint have been resolved, the Clerk of the

Court is respectfully requested to close this case.


**IT IS SO ORDERED.**

DATED:     New York, New York
           May 2, 2005

                              _____
                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

Copies of the foregoing have been mailed on this date to the following:


Pro Se Plaintiff
David Williams
89 Porter Avenue, Bed # 113
Brooklyn, NY 11237

Counsel for Defendant
Michael Chestnov
Corporation Counsel
100 Church Street
New York, NY 10007